IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JACK MARINCOVICH, et al.,      )
                               )
                Plaintiffs,    )      Civil No. 07-6228-HO
                               )
         v.                    )      O R D E R
                               )
CONRAD C. LAUTENBACHER, JR.,   )
et al.,                        )
                               )
                Defendant.     )

Plaintiffs allege damage and continuing harm as a result of the listing of the Lower Columbia River Coho salmon ESU, as defined by defendants, under the Endangered Species Act, 16 U.S.C. § 153 1 et seq., which listing occurred on or about June 28, 2005. Plaintiffs seek a judgment declaring the defendants' listing determination of June 28, 2005, as to the Lower Columbia River (LCR) Coho salmon invalid and unlawful under the Endangered Species Act (ESA) and arbitrary and capricious or an abuse of discretion or otherwise not in accordance with law under the Administrative

Procedure Act (APA). Plaintiffs further pray for an injunction prohibiting defendants or others from taking any action to enforce the listing determination of June 28, 2005, as to Lower Columbia River Coho salmon.

In Alsea Valley Alliance v. Lautenbacher, 06-6093, similarly situated plaintiffs challenged, among other listings, the listing decision of defendant the National Marine Fisheries Service (NMFS) to list the Lower Columbia River Coho ESU as illegally distinguishing between naturally spawned and hatchery salmon in violation of the ESA and as arbitrary and capricious in violation of the APA, 5 U.S.C. 3 706(2)(A). The plaintiffs in this case sought to intervene, but filed this separate suit because they had failed to give the required 60 day notice.

The court in Alsea Valley found that the NMFS did not violate the ESA and APA by distinguishing between hatchery stocks and "natural" salmon populations in its listing process, promulgating a protective regulation that distinguishes between hatchery stocks and natural populations and including salmon populations that do not interbreed in listed population segments with respect to 16 population segments including the challenged listing in this case.

Plaintiffs here argue that the Lower Columbia River Coho population is stable and/or increasing and not in danger of extinction. Plaintiffs also argue that the defendants failed to consider the adequacy of existing regulatory mechanisms and efforts

to protect the coho in its listing decision and that the listing does not show the population is threatened over all or a significant portion of the defined range.  Plaintiffs also assert that defendants failed to consider the Washington and Oregon departments of fish and wildlife notations of errors.

A.   Motion to Supplement the Record (#9)

Before the court can evaluate plaintiffs' challenge to the listing, the court must first consider plaintiff's motion to supplement the administrative record or alternatively for judicial notice of facts contained in the documents sought to be added.

Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court.  Camp v. Pitts, 411 U.S. 138, 142 (1973).  Review may, however, be expanded beyond the record if necessary to explain agency decisions.  Animal Defense Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir. 1988).  In the Ninth Circuit, extra record materials are allowed only

> (1) if necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) "when the agency has relied on documents not in the record," or (3) "when supplementing the record is necessary to explain technical terms or complex subject matter."

Southwest Center for Biological Diversity v. U.S. Forest Service, 100 F.3d 1443, 1450 (9th Cir. 1996) (quoting Inland Empire Pub.

Lands Council v. Glickman, 88 F.3d 697, 703-04 (9th Cir. 1996)). Extra-record materials may also be admitted "when plaintiffs make a showing of agency bad faith." National Audubon Soc. v. U.S. Forest Serv., 46 F.3d 1437, 1447 n. 9 (9th Cir. 1993). These exceptions are narrowly construed and applied. Lands Council v. Powell, 379 F.3d 738, 747 (9th Cir. 2004) (superceded on other grounds by The Lands Council v. Powell, 395 F.3d 1019 (9th Cir. 2005).

To the extent plaintiffs seek to provide post decision data or documents already included in the record, the motion to supplement is denied. Additionally, to the extent that plaintiffs seek to add documentation regarding data unrelated to the ESU in question, the motion is denied. The motion is otherwise granted.


B.   Cross-Motions for Summary Judgment

This case essentially boils down to plaintiff's contention that the abundance of hatchery coho (which plaintiffs contend defendants ignored) in the ESU demonstrates no risk. The NMFS found that a loss of naturally spawning populations, the low abundance of extant populations, diminished diversity, and fragmentation and isolation of the remaining naturally produced fish confer considerable risks to the ESU. This court has already determined that the ESA does not prohibit this approach. Alsea Valley Alliance v. Lautenbacher, 2007 WL 2344927 (D.Or. August 14,

2007) at *1.[1]  Given the deferential standards in the ESA and APA, the court must deny plaintiff's challenge in this case.

The ESA requires NMFS to publish lists of endangered[2] and threatened[3] species in the Federal Register.  16 U.S.C. §§ 1533(a)(1), (c)(1).  "The term 'species' includes any subspecies of fish . . .  and any distinct population segment of any vertebrate fish . . . which interbreeds when mature."  16 U.S.C. § 1532(16). The term "distinct population segment" (DPS) is not defined in the ESA.  NMFS considers a stock of Pacific salmon as a DPS if it "represents an evolutionarily significant unit (ESU) of the biological species."  58 Fed.Reg. 58,612, 58,618 (Nov. 20, 1991).

> A stock must satisfy two criteria to be considered an ESU:
> (1) It must be substantially reproductively isolated from other conspecific population units; and
> (2) It must represent an important component in the evolutionary legacy of the species.
> * * *
> Insights into the extent of reproductive isolation can be provided by movements of tagged fish, recolonization

---

[1]The decision refers to the approach of considering the extinction risk of population segments comprised of natural salmon populations and hatchery stocks, before making a final listing determination.  The Hatchery Listing Policy provides that hatchery stocks are included in assessing an ESU's status in the context of their contributions to conserving natural self-sustaining populations.

[2]"The term 'endangered species' means any species which is in danger of extinction throughout all or a significant portion of its range . . ."  16 U.S.C. § 1532(6).

[3]"The term 'threatened species' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).

rates of other populations, measurements of genetic
differences between populations, and evaluations of the
efficacy of natural barriers. Each of these methods has
its limitations.

58 Fed.Reg. at 58,618.

The ESA requires that NMFS issue "such regulations as [it]

deems necessary and advisable to provide for the conservation of

[threatened] species." 16 U.S.C. § 1533(d).

The terms "conserve", "conserving", and "conservation"
mean to use and the use of all methods and procedures
which are necessary to bring any endangered species or
threatened species to the point at which the measures
provided pursuant to this chapter are no longer
necessary. Such methods and procedures include, but are
not limited to, all activities associated with scientific
resources management such as research, census, law
enforcement, habitat acquisition and maintenance,
propagation, live trapping, and transplantation, and, in
the extraordinary case where population pressures within
a given ecosystem cannot be otherwise relieved, may
include regulated taking.

16 U.S.C. § 1532(3).

An agency's actions pursuant to the ESA are reviewed under the

APA, 5 U.S.C. § 706(2)(A). NMFS's decision must be upheld unless

it is found to be arbitrary, capricious, or otherwise not in

accordance with law. The scope of review under the arbitrary and

capricious standard is narrow and a court is not to substitute its

judgment for that of the agency. Nevertheless, the agency must

examine the relevant data and articulate a satisfactory explanation

for its action including a rational connection between the facts

found and the choice made. Burlington Truck Lines v. United

States, 371 U.S. 156, 168 (1962). Courts look at whether the

6 - ORDER

decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  <u>Bowman Transp. Inc. v. Arkansas-Best Freight System</u>, 419 U.S. 281, 285 (1974). Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  The reviewing court should not attempt itself to make up for such deficiencies, but should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).[4]

This court has already reviewed defendants' listing decision in the context of a challenge to a larger number of listing decisions in <u>Alsea Valley v. Lautenbacher</u>, 2007 WL 2344927 (D.Or. August 14, 2007).

NMFS published a "Policy on the Consideration of Hatchery-Origin Fish in Endangered Species Act Listing Determinations for

---

[4]Plaintiffs' assertion that deference to the agency decision has been severely restricted is not well-taken.  <u>See</u> <u>National Ass'n of Home Builders v. Defenders of Wildlife</u>, 127 S.Ct. 2518, 2529-30 (2007) (quoting <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) in reiterating the standard of review.

Pacific Salmon and Steelhead" (Hatchery Policy) 70 Fed.Reg. 37,204, 37,215 (June 28, 2005), and a final rule including listing determinations for 16 ESUs (including the ESU challenged here) of West Coast salmon and amendments to protective regulations. Id. at 37,160.

The Hatchery Policy provides direction to NMFS personnel for considering hatchery-origin fish in making ESA listing determinations for Pacific salmon and steelhead. Id. at 37,215. The Hatchery Policy includes the following features, among others.

> In delineating an ESU to be considered for listing, NMFS will identify all components of the ESU, including populations of natural fish (natural populations) and hatchery stocks[5] that are part of the ESU. Hatchery stocks with a level of genetic divergence relative to the local natural population(s) that is no more than what occurs within the ESU: (a) are considered part of the ESU; (b) will be considered in determining whether an ESU should be listed under the ESA; and (c) will be included in any listing of the ESU.

> Status determinations for Pacific salmon and steelhead ESUs will be based on the status of the entire ESU. In assessing the status of an ESU, NMFS will apply this policy in support of the conservation of naturally-spawning salmon and the ecosystems upon which they depend, consistent with section 2 (b) of the ESA (16 U.S.C. 1531(b)). Hatchery fish will be included in assessing an ESU's status in the context of their

_____

[5]The term "natural populations" refers to populations whose members originate from spawning in the wild, "recognizing that these fish may be the progeny of naturally-spawned and hatchery-origin fish in varying proportions." 70 Fed.Reg. at 37,214. The term "hatchery stocks" refers to a "genetic lineage of hatchery fish propagated at one or more hatchery facilities, recognizing that a hatchery stock can have a wide range of gene flow with populations of natural-origin fish . . ." Id.

contributions to conserving natural self-sustaining populations.

Status determinations for Pacific salmon and steelhead ESUs generally consider four key attributes: abundance; productivity; genetic diversity; and spatial distribution. The effects of hatchery fish on the status of an ESU will depend on which of the four key attributes are currently limiting the ESU, and how the hatchery fish within the ESU affect each of the attributes. The presence of hatchery fish within the ESU can positively affect the overall status of the ESU, and thereby affect a listing determination, by contributing to increasing abundance and productivity of the natural populations in the ESU, by improving spatial distribution, by serving as a source population for repopulating unoccupied habitat, and by conserving genetic resources of depressed natural populations in the ESU. Conversely, a hatchery program managed without adequate consideration of its conservation effects can affect a listing determination by reducing adaptive genetic diversity of the ESU, and by reducing the reproductive fitness and productivity of the ESU. In evaluating the effect of hatchery fish on the status of an ESU, the presence of a long-term hatchery monitoring and evaluation program is an important consideration.

Many hatchery programs are capable of producing more fish than are immediately useful in the conservation and recovery of an ESU and can play an important role in fulfilling trust and treaty obligations with regard to harvest of some Pacific salmon and steelhead populations. For ESUs listed as threatened, NMFS will, where appropriate, exercise its authority under section 4(d) of the ESA to allow the harvest of listed hatchery fish that are surplus to the conservation and recovery needs of the ESU, in accordance with approved harvest plans.

Id. at 37,214-16, ¶¶ 2-5.

Prior to publishing its listing determinations, NMFS completed status reviews for 27 ESUs, including the LCR ESU at issue in this proceeding:

[The] NMFS'[s] Pacific Salmonid Biological Review Team (BRT) "reviewed the viability and extinction risk of naturally spawning populations in the . . . ESUs . . . The BRT evaluated the risk of extinction based on the performance of the naturally spawning populations in each of the ESUs under the assumption that present conditions will continue into the future. The BRT did not explicitly consider artificial propagation in its evaluations. The BRT assessed ESU-level extinction risk (as indicated by the viability of the naturally spawning populations at . . . the individual population level, then at the overall ESU level.
* * *
Individual populations were evaluated according to . . . abundance, productivity, spatial structure (including connectivity), and diversity.
* * *
After reviewing all relevant biological information for the populations in a particular ESU, the BRT ascribed an ESU-level risk score for each of the[se] . . . [four] factors.
* * *
In general, [the BRT's] evaluations did not include consideration of the potential contribution of hatchery stocks to the viability of ESUs, or evaluate efforts being made to protect the species. Therefore, the BRT's findings are not recommendations regarding listing.
* * *
To assist in determining the ESU membership of individual hatchery stocks, a Salmon and Steelhead Hatchery Assessment Group (SSHAG) . . . evaluated the best available information describing the relationships between hatchery stocks and natural ESA-listed salmon and anadromous populations in the Pacific Northwest and California. The SSHAG produced a report . . . describing the relatedness of each hatchery stock to the natural component of an ESU on the basis of stock origin and the degree of known or inferred genetic divergence between the hatchery stock and the local natural population(s). [The NMFS] used the information presented in the SSHAG Report to determine the ESU membership of those hatchery stocks within the historical geographic range of a given ESU. [The NMFS's] assessment of individual hatchery stocks and . . . findings regarding their ESU membership are detailed in the Salmonid Hatchery Inventory and Effects Evaluation [SHIEE] Report (NMFS, 2004b).

The assessment of the effects of ESU hatchery programs on ESU viability and extinction risk is also presented in the [SHIEE] Report . . . The Report evaluates the effects of hatchery programs on the likelihood of extinction of an ESU on the basis of . . . abundance, productivity, spatial structure, and diversity[,] and how artificial propagation efforts within the ESU affect those factors. In April 2004, [the NMFS] convened an Artificial Propagation Evaluation Workshop [APEW] of Federal scientists and managers with expertise in salmonid artificial propagation. The [APEW] reviewed the BRT's findings . . ., evaluated the [SHIEE] Report . . ., and assessed the overall extinction risk of ESUs with associated hatchery stocks. The discussions and conclusions of the [APEW] are detailed in a workshop report . . . In this document, the extinction risk of an ESU "in-total" refers to the assessed level of extinction risk after considering the contributions to viability by all components of the ESU (hatchery origin, natural origin, anadromous, and resident).

Id. at 37,162-63.

Hatchery stocks are included in an ESU if it is determined that they are not reproductively isolated from populations in the ESU, and they are representative of the evolutionary legacy of the ESU . . . Hatchery stocks are considered representative of the evolutionary legacy of an ESU, and hence included in the ESU, if it is determined that they are genetically no more than moderately divergent from the natural population (see final Hatchery Listing Policy . . .). If a hatchery stock is more divergent from the local natural population, this indicates that the hatchery stock is reproductively isolated from the ESU.

Id. at 37,174.

As part of the final rule, NMFS issued "clarifying amendments" to protective regulations that apply the amended take prohibitions to all threatened ESUs. Id. at 37,194-95. Under the final rule, NMFS "will apply Section 1533(d) protections to natural and hatchery fish with an intact adipose fin, but not to listed

hatchery fish that have had their adipose fin removed prior to release into the wild." Id. at 37,194.

> Not all hatchery stocks considered to be part of listed
> ESUs are of equal value for use in conservation and
> recovery. Certain ESU hatchery stocks may comprise a
> substantial portion of the genetic diversity remaining in
> a threatened ESU, and thus are essential assets for
> ongoing and future recovery efforts. If released with
> adipose fins intact, hatchery fish in these populations
> would be afforded protections under the amended 4(d)
> protective regulations. NMFS, however, may need to
> approve the take of listed hatchery stocks to manage the
> number of naturally spawning hatchery fish to limit
> potential adverse effects on the local natural
> population(s). Other hatchery stocks, although
> considered to be part of a threatened ESU, may be of
> limited or uncertain conservation value at the present
> time. Artificial propagation programs producing
> within-ESU hatchery populations could release
> adipose-fin-clipped fish, such that protections under
> 4(d) would not apply, and these hatchery fish could
> fulfill other purposes (e.g., fulfilling Federal trust
> and tribal treaty obligations) while preserving all
> future recovery options.

Id. at 37,195.

In this case, plaintiffs raise challenges specific to the LCR coho listing decision and argue that during the period the LCR coho ESU was under consideration, the agency was reviewing 26 West coast salmon populations from several states and that such a workload leads to errors. Plaintiffs contend that:

> (1) The Recent History of the Lower Columbia River Coho Shows
> That This Salmon Population Is Stable at Historic Levels,
> Not in Danger of Extinction, Especially Since NMFS Has
> Twice Before Found Under the ESA that These Coho Salmon
> Are Not a "Species" and Are Not Threatened.

> (2) The Lower Columbia River Coho ESA is Defined by NMFS to
> Include 21 Hatchery Stocks, Which Have Produced and Still

Produce Hundreds of Thousands of Returning Adult Coho Each Year.

(3) The 2005 "Listing" of the LCR Coho Appears to Be Based Upon the False Premise that the Non-Hatchery Populations in Upper Clackamas River and Sandy River Are "Natural" or "Native" in Origin, When the Undisputed Facts Show that the Coho Salmon Returning to the Clackamas and Sandy Rivers Are Either Completely Derived from Hatchery Stocks or Significantly Influenced by Hatchery Stock Out-Plantings Over Many Decades.

(4) Non-Hatchery Populations of the Upper Clackamas River and Sandy River are not Decreasing or Failing, But are Stable or Increasing, as Shown by Undisputed Facts.

(5) The Current Adult Coho Salmon Returns to the Willamette River Which Were Established by Out-Planting of Hatchery Stock Coho and Are Now Self-Sustaining, Show the Viability, Resilience and Survivability of the Coho, and Thus Contradict Any Unarticulated Concerns About Hatchery Coho.

(6) NMFS Has Previously Found in 1991 the Lower Columbia River Coho, Because of Historical Practices of Transferring Juvenile Coho Salmon from Various Hatcheries into Rivers Throughout the Lower Columbia, do not Represent a "Species" Under the Endangered Species Act.

(7) NMFS "Listing" of the LCR Coho Failed to Consider the Adequacy of Existing Regulatory Mechanisms as Required by 16 U.S.C. § 1533(a) and Efforts to Protect the LCR Coho.

(8) NMFS Has Defined the LCR Coho ESU with a Very Large Geographic Distribution, and the "Listing" Does Not Show that the Population Is "Threatened" Over "All or a Significant Portion of Its Range".

(9) The WDFW/ODFW Pointed Out to NMFS Errors in the "Listing," Which Were Not Remedied and Further Infect the "Listing" With Error.

1.  Stability at Historic Levels, Hatchery Production, Current Returns

Plaintiffs premise their argument based on successful production of coho at hatcheries beginning in the 1960s and the current large number of hatchery coho produced. Plaintiffs also recite previous NMFS decisions not to list in the 1990s and contend that because returns are at historic levels of return, there can be no rational finding of the coho as threatened. Plaintiffs primarily rely on sheer numbers of returning adult coho and note the significant increase in the last ten years as opposed to 50 years ago. Plaintiffs conclude that there is no justification for the listing other than a "vague concern about hatchery practices, a concern which is established as unjustified by the 'very successful' hatchery programs with LCR Coho." Plaintiffs also contend that hatchery and natural coho are only moderately divergent genetically and the two have become homogenized.

The record demonstrates that NMFS did consider the abundance of hatchery fish in the ESU. See, e.g., AR 1855 at 22-25 (hatchery production and genetic risks); AR 1349 at 499-507 (data and analysis of  of spawner abundance and new hatchery information noting total expected return of hatchery coho salmon to the Columbia basin in 2002 was over a million adults); AR 1346 at 394 to 429 (noting high proportion of hatchery salmon and low proportion of naturally spawned); AR 1345 at 45-48 (noting for

14 - ORDER

instance that the within-ESU hatchery programs significantly increase the abundance of the ESU in-total; and that although these programs have the potential of preserving historical local adaptation and behavioral and ecological diversity, the manner in which these potential genetic resources are presently being managed poses significant risks to the diversity of the ESU in-total). However, it was not just sheer numbers NMFS concerned itself with. In addressing the issue whether there should be distinction between hatchery and natural fish and whether sheer abundance should determine the listing, NMFS explained:

> A few commenters felt that extinction risk should be evaluated based on the total abundance of fish within the defined ESU without discriminating between fish of hatchery or natural origin. These commenters contended that the District Court in Alsea ruled that once an ESU is defined, risk determinations should not discriminate among its components. The commenters described the risk of extinction as the chance that there will be no living representatives of the species, and that such a consideration must not be biased toward a specific means of production (artificial or natural).
> Response: The Alsea ruling does not require any particular approach to assessing extinction risk. The court ruled that if it is determined that a DPS warrants listing, all members of the defined species must be included in the listing. The court did not rule on how the agency should determine whether the species is in danger of extinction or likely to become so in the foreseeable future. The commenters assert that the viability of an ESU is determined by the total numbers of fish. The risk of extinction of an ESU depends not just on the abundance of fish, but also on the productivity, spatial distribution, and diversity of its component populations (Viable Salmonid Populations (VSP) factors; McElhany et al., 2000; Ruckelshaus et al., 2002). In addition to having sufficient abundance, viable ESUs and populations have sufficient productivity, diversity, and a spatial distribution to survive environmental variation

and natural and human catastrophes. The commenters also
assume that hatchery managers will continue to produce
the same numbers of the same stock and quality of fish
with the same success as in the past. In many cases, such
assumptions are not warranted.

70 Fed. Reg. 37,165.

With respect to the LCR ESU in particular, NMFS found that:

There are only two extant populations in the Lower
Columbia River coho ESU with appreciable natural
production (the Clackamas and Sandy River populations),
from an estimated 23 historical populations in the ESU.
Although adult returns in 2000 and 2001 for the Clackamas
and Sandy River populations exhibited moderate increases,
the recent 5-year mean of natural-origin spawners for
both populations represents less than 1,500 adults. The
Sandy River population has exhibited recruitment failure
in 5 of the last 10 years, and has exhibited a poor
response to reductions in harvest. During the 1980s and
1990s natural spawners were not observed in the lower
tributaries in the ESU. Coincident with the 2000-2001
abundance increases in the Sandy and Clackamas
populations, a small number of coho spawners of unknown
origin have been surveyed in some lower tributaries.
Short- and long-term trends in productivity are below
replacement. Approximately 40 percent of historical
habitat is currently inaccessible, which restricts the
number of areas that might support natural production,
and further increases the ESU's vulnerability to
environmental variability and catastrophic events. The
extreme loss of naturally spawning populations, the low
abundance of extant populations, diminished diversity,
and fragmentation and isolation of the remaining
naturally produced fish confer considerable risks to the
ESU. The paucity of naturally produced spawners in this
ESU is contrasted by the very large number of hatchery
produced adults. The abundance of hatchery coho returning
to the Lower Columbia River in 2001 and 2002 exceeded one
million and 600,000 fish, respectively.

....

Artificial propagation in this ESU continues to represent
a threat to the genetic, ecological, and behavioral
diversity of the ESU. Past artificial propagation efforts
imported out-of-ESU fish for broodstock, generally did

not mark hatchery fish, mixed broodstocks derived from different local populations, and transplanted stocks among basins throughout the ESU. The result is that the hatchery stocks considered to be part of the ESU represent a homogenization of populations. Several of these risks have recently begun to be addressed by improvements in hatchery practices. Out-of-ESU broodstock is no longer used, and near 100-percent marking of hatchery fish is employed to afford improved monitoring and evaluation of broodstock and (hatchery- and natural-origin) returns. However, many of the within-ESU hatchery programs do not adhere to best hatchery practices. Eggs are often transferred among basins in an effort to meet individual program goals, further compromising ESU spatial structure and diversity. Programs may use broodstock that does not reflect what was historically present in a given basin, limiting the potential for artificial propagation to establish locally adapted naturally spawning populations. Many programs lack Hatchery and Genetic Management Plans that establish escapement goals appropriate for the natural capacity of each basin, and that identify goals for the incorporation of natural-origin fish into the broodstock.

Our assessment of the effects of artificial propagation on ESU extinction risk concluded that hatchery programs collectively mitigate the immediacy of extinction risk for the Lower Columbia River coho ESU in-total in the short term, but that these programs do not substantially reduce the extinction risk of the ESU in the foreseeable future (NMFS, 2004c). At present, within ESU hatchery programs significantly increase the abundance of the ESU in-total. Without adequate long-term monitoring, the contribution of ESU hatchery programs to the productivity of the ESU in-total is uncertain. The hatchery programs are widely distributed throughout the Lower Columbia River, reducing the spatial distribution of risk to catastrophic events. Additionally, reintroduction programs in the Upper Cowlitz River may provide additional reduction of ESU spatial structure risks. As mentioned above, the majority of the ESU's genetic diversity exists in the hatchery programs. Although these programs have the potential of preserving historical local adaptation and behavioral and ecological diversity, the manner in which these potential genetic resources are presently being managed poses significant risks to the diversity of the ESU in-total. At present, the Lower Columbia River coho hatchery programs reduce risks to ESU

abundance and spatial structure, provide uncertain benefits to ESU productivity, and pose risks to ESU diversity. Overall, artificial propagation mitigates the immediacy of ESU extinction risk in the short-term, but is of uncertain contribution in the long term.

Over the long term, reliance on the continued operation of these hatchery programs is risky (NMFS, 2005b). Several Lower Columbia River coho hatchery programs have been terminated, and there is the prospect of additional closures in the future. With each hatchery closure, any potential benefits to ESU abundance and spatial structure are reduced. Risks of operational failure, disease, and environmental catastrophes further complicate assessments of hatchery contributions over the long term. Additionally, the two extant naturally spawning populations in the ESU were described by the BRT as being "in danger of extinction." Accordingly, it is likely that the Lower Columbia River coho ESU may exist in hatcheries only within the foreseeable future.

70 Fed. Reg. 37,188-89.

NMFS did not fail to consider the aspect of hatchery fish and the long term success of the hatchery program reflected in historical returns. In addition, the conclusions reached regarding the risk to the ESU were reasonable and consistent with the Hatchery Listing Policy. As noted in <u>Alsea Valley v. Lautenbacher</u>, the ESA does not prohibit the listing process that the agency used. 2007 WL 2344927 at *5. Plaintiffs' offer of information regarding the extensive hatchery production that began in the 1960s and flourishes to the present does not account for this aspect of the policy. The record contains adequate reasoning as to the finding that poorly run hatcheries are detrimental to the long-term health of the coho. <u>See, e.g.</u>, AR 422 (The record supports that hatchery

salmonids have lower reproductive success and lower survival than wild fish).

Fifteen experts and 29 observers on the Artificial Propagation Evaluation Workshop convened by NMFS to evaluate the West Coast Salmon biological review teams conclusions regarding extinction risks considered dissenting views now raised again by plaintiffs and gave a rational explanation as to why those views lacked merit. Plaintiffs essentially challenge the conclusions by arguing facts that were generally considered by the NMFS and do not make a valid scientific challenge to the conclusions. This court must give deference to the scientific and expertise necessarily involved in the NMFS determination.

NMFS determination that despite the large numbers of hatchery fish, the hatchery program has been unsuccessful is reasonable given its finding that only two natural populations remain and those are in danger. See, e.g., AR 1349 at 520:

> In the only two populations with significant natural production (Sandy and Clackamas), short and long-term trends are negative and productivity (as gauged by preharvest recruits) is down sharply from recent (1980s) levels....
> The paucity of naturally produced spawners in this ESU can be contrasted with the very large number of hatchery-produced adults. Although the scale of the hatchery programs, and the great disparity in relative numbers of hatchery and wild fish, produce many genetic and ecological threats to the natural populations, collectively these hatchery populations contain a great deal of genetic resources that might be tapped to help

promote restoration of more widespread naturally spawning populations.[6]

Such findings, however, lead to plaintiffs' arguments that there are no native stock LCR coho any longer, that the current LCR coho are hybridized stocks that do not constitute a distinct population segment of an ESU and that non-hatchery populations in the upper Clackamas river and Sandy river are not decreasing or failing.[7]

2.   Existence of Natural Spawners

Plaintiffs contend that it is "undisputed" that both coho populations in the upper Clackamas and Sandy Rivers are exclusively or primarily hatchery in origin because of extirpation by dam blockage and re-establishment of coho salmon through releasing non-

---

[6]NMFS expert assessment that an LCR ESU residing solely or primarily in hatchery stocks is threatened by loss of genetic diversity and additionally suffers uncertainties in future hatchery programs, while disagreed with by plaintiffs is not contrary to the ESA or APA.  NMFS also found and plaintiffs fail to demonstrate clearly any successful completely isolated hatchery system persisting for any appreciable time.  See AR 2167-01.  Further evidence of concerns with hatchery programs are identified at AR 1345 at 29-30 (funding provided utility corporations pursuant to licensing requirements that are likely to change)  and AR 1346 at 427 (future funding uncertain).

[7]The argument that the numbers are not decreasing is again based on the hatchery programs. As noted above, NMFS reasonably determined the hatchery and natural populations should not be treated or counted equally.  Moreover, defendants noted uncertainties with regard to future hatchery operations.

native hatchery stocks.  However, NMFS reasonably concluded that the Clackamas and Sandy populations are natural spawners.[8]

Although dam blockage on the upper Clackamas River occurred from 1917 to 1939, the record demonstrates that wild coho reestablished a population in the upper basin after fish passage was restored in 1939.  <u>See</u> AR 1479 at 60.

> The Clackamas River historically had runs of coho salmon and other anadromous species. However, the river also has a long history of obstructions to fish passage by dams. Cazadero Dam (1905, River Kilometer (RKm) 47) and River Mill Dam (1911, RKm 38) were the first large dams to completely block river flow. Both dams were equipped with fish passage facilities, which were often blocked for egg taking. In 1917, the fish ladder at Cazadero Dam washed out, and for 22 years, until the fish ladder was finally restored in 1939, coho salmon were unable to access the upper Clackamas River.
>
> Subsequently, the upper river was repopulated by natural immigration and, possibly, unrecorded releases. Because of the relatively low success of hatcheries at producing adult coho salmon at that time (Hopley undated, Lichatowich and Nicholas in press), the immigrants were most likely natural coho salmon from either the Clackamas River below RKm 47, the Willamette River, or elsewhere in the lower Columbia River. In 1958, North Fork Dam was built at RKm 50. This dam was built with an extensive

---

[8]Defendants first argue that plaintiffs waived this argument by failing to raise it during the comment period.  A party's failure to make an argument before the administrative agency in comments on a proposed action bar it from raising that argument on judicial review.  <u>See</u> <u>Universal Health Services, Inc. v. Thompson</u>, 363 F.3d 1013, 1019-20 (9th cir. 2004).  The proposed finding was published in the federal register in June of 2004 and during the 151 day comment period and plaintiffs' point to no comments disputing the finding that the Clackamas and Sandy river populations were natural.  Plaintiffs contend that defendants admitted that some comments were received regarding genetic homogenization, but do not site the record for such comments regarding Sandy and Clackamas.

21 - ORDER

fish passage facility that has allowed enumeration of
salmon entering and leaving the upper Clackamas River.

The ODFW reached the same conclusion. <u>See</u> AR 2185 (#26) at p.
4 (wild coho repopulated in the upper basin); p. 18 (wild fish have
re-colonized the area where the original population had been
eliminated from 1917 to 1939).[9]

As to the Sandy River the ODFW similarly found the fish
population to be wild. AR 2185 at p. 4.

> The Sandy River population above Marmot Dam and the
> Clackamas River population(s) above North Fork Dam are
> the only populations in the ESU for which natural
> production trends can be estimated. The portion of the
> Sandy River population above Marmot Dam has almost no
> hatchery-origin spawners, while the area below the dam is
> dominated by hatchery-origin spawners.

AR 1349 at 504. <u>See also</u>, AR 1348 at pp. 83-86.

Such conclusions were reached by examining data that post
dated the 1991 and 1995 NMFS decisions not to list. Plaintiffs
raise factual disputes, but do not adequately challenge the agency
evaluation of the scientific data. The ODFW, relied upon by
plaintiff for their assertions has itself, in 1999, listed LCR coho
in danger of extinction under Oregon's ESA after finding the
Clackamas and Sandy populations natural. AR 1855 at 12 and 24.

While some may disagree with this assessment, it is not
irrational or arbitrary and, thus, the assessment binding on the
court. The fifteen scientists on the 2001 Biological Review Team

_____

[9]This is not part of the original administrative record, but was
added because defendants' Biological Review Team considered it.

22 - ORDER

concluded that though no truly pristine populations exist, there is evidence for significant natural production in the Sandy and Clackamas that represent the clearest link to historic populations. AR 1855 at 3.

### 3.   Distinct ESU

Plaintiffs argue that the historic record shows homogenization of coho stocks and that previous NMFS findings also demonstrate this and thus the stocks do not constitute an evolutionary significant unit.  As noted above, NMFS considered post 1995 data.

The NMFS ESU policy has previously been upheld by this court. Alsea Valley v. Evans, 161 F.Supp.2d 1154 (D.Or. 2001).[10]  The Biological Review Team concluded that the consistent genetic and life histories differences between the LCR Coho and populations from other areas and that the Clackamas and Sandy populations represent a clear link to historic populations.  AR 1855 at p. 15. Despite plaintiffs' arguments regarding hatchery and natural interbreeding, the Team found hatchery-produced fish contain a significant portion of the historic diversity.  Id. The scientific evidence reviewed by NMFS rationally establishes a genetic distinction from other coho populations.  The Team relied on 1999

---

[10]The ESU Policy provides that a salmon stock must meet two criteria to qualify as an ESU: "(1) it must be substantially reproductively isolated from other conspecific population units; and (2) it must represent an important component in the evolutionary legacy of the species." 56 Fed. Reg. 58,612, 58,618 (Nov. 20, 1991).

DNA analysis, and 1995 and 2001 genetic data.  AR 1855 at 14.  The

new data negates the suggestion in the 1991 status review that non-

indigenous stock transfers from the Oregon coast and other regions

obliterated the historical LCR ESU.  Plaintiffs fail to demonstrate

a significant flaw in the science.[11]


4.   Adequacy of Existing Regulatory Mechanisms

Plaintiffs  contend  that  NMFS  failed  to  consider  existing

efforts to protect coho, such as ODFW and WDFW efforts to manage

and  nurture  the  fish.    However,  NMFS  did  extensively  review

hatchery  programs  run  by  both  states.    As  noted  above,  NMFS

reasonably  found  the  hatchery  programs  inadequate.    NMFS  also

considered the various recovery plans:

> [The Policy for Evaluation of Conservation Efforts When
> Making  Listing  Decisions  (PECE)]  requires  that
> conservation efforts provide such certainty at the time
> of  a  listing  determination,  and  although  we  are  very
> supportive of these recovery planning efforts, we feel
> that  these  efforts  lack  this  certainty.  For  example,
> while the LCFRB and Oregon coho recovery plans lay out
> actions that, if implemented, would address threats to
> Lower  Columbia  River  coho,  all  the  laws  and  regulations
> necessary  to  implement  those  actions  are  not  yet  in
> place, nor is there a high level of certainty that the
> actions  will  be  funded.  Similarly,  while  the  plans
> identify  the  nature  and  extent  of  threats  to  Lower
> Columbia River coho, they do not as yet address the full
> suite  of  PECE  criteria  for  certainty  of  effectiveness
> (such as establishing quantifiable performance measures

---

[11]Moreover,  the  NMFS  reasonably  determined  that  the  coho
population above the Willamette Falls is not part of the ESU.  70 Fed.
Reg.  37,172-73  (insufficient  information  regarding  reproductive
isolation).

for monitoring compliance and effectiveness, and employing adaptive management). While we expect that as the plans evolve these elements will be developed, our listing determination must be based on whether the plans are currently certain to improve the status of the species.

70 Red. Reg. 37,172.

NMFS did evaluate existing protective measures and even considered possible future measures, but it need not give future conservation efforts weight.


5.  Comments from ODFW and WDFW

Plaintiffs contend that NMFS ignored important biological information provided by the states that coho populations which spawn in the gravel (as opposed to spawning in hatcheries) had been identified in numerous other streams, and up to 1,000,000 of such juvenile Coho existed.  These comments came five months after the comment period closed.  In these comments Washington and Oregon asserted that they had "new coho smolt abundance estimates" for certain LCR tributaries and updated estimates of the Clackamas and Sandy populations. Martin Decl. Exhibit. 12.  The states did not provide any data or analyses supporting the figures in their belated comments. Id. Nor did they provide any specific information purporting to contradict the Biological Review Teams's findings regarding the scarcity of naturally produced spawners throughout the ESU, which was the Team's most serious overall concern. 2003 BRT Report. AR 1349 at 499-504 and 520; Martin Decl. Exhibit. 12.

Moreover, an agency is not required to consider issues and evidence in comments that are not timely filed." <u>Appalachian Power Co. v. EPA</u>, 249 F.3d 1032, 1059 (D.C. Cir. 2001). Additionally, NMFS did explain that the 2003 BRT considered available data on naturally-reproducing coho populations throughout the ESU, including the streams referenced in the states' late comments, and that any purported short-term increase in adult returns for the Clackamas and Sandy populations "would not affect our concern about the long-term poor performance of [LCR] coho overall, nor would it alleviate concerns regarding the limited spatial distribution, poor connectivity, and degraded diversity of [LCR] coho." AR 2087 at 1.

<u>6. Summary</u>

Plaintiffs primarily attack the numbers in this challenge to a listing decision and do not generally address the science. Disputes involving "primarily issues of fact" must be resolved in favor of the expert agency so long as the agency's decision is based on a reasoned evaluation of the relevant factors. <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 377-78 (1989). A Court must look at the decision not as the biologist or statistician that courts are qualified neither by training nor experience to be, but as a reviewing court exercising its narrowly defined duty of holding agencies to certain minimal standards of

rationality.  <u>See</u> <u>Ethyl Corp. v. Environmental Protection Agency</u>,
541 F.2d 1, 36 (D.C. Cir. 1976).

NMFS analyzed the complex genetic data, interpreted marine
coded-wire-tag recoveries, assessed the origin and viability of
small, self-sustaining populations based upon incomplete but the
best available data, dating back nearly a century, and predicted
the likely conservation benefits of hatchery stocks and the overall
ESU extinction risks.  The court cannot disturb this rational
decision.  While plaintiffs may suffer economic harms and disagree
with NMFS's conclusions, such does not justify vacating the listing
decision.  The decision to list the LCR coho ESU as threatened is
upheld.


CONCLUSION

For the reasons stated above, defendants' motion for summary
judgment (#22) is granted and plaintiffs' motion for summary
judgment (#9) is denied.  Additionally, plaintiffs' motion to
supplement (#13) is granted in part and denied in part.


DATED this _____31st____ day of March, 2008.

                          ___s/ Michael R. Hogan_____
                          United States District Judge